# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMCA-042**

**Filing Date: April 5, 2022**

**No. A-1-CA-38534**

**AUDREY JUNE AUTREY,**

       Petitioner/Counterrespondent-Appellant,

v.

**CLINT A. AUTREY,**

       Respondent/Counterpetitioner-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Jane C. Levy, District Judge**

Michael Danoff & Associates, P.C.
Michael L. Danoff
Brett J. Danoff
Albuquerque, NM

for Appellant

Cortez & Hoskovec
Michelle Cortez
Albuquerque, NM

L. Helen Bennett
Albuquerque, NM

for Appellee

## OPINION

**YOHALEM, Judge.**

**{1}** In this divorce proceeding, Audrey June Autrey (Wife) appeals the district court's characterization of assets and debts as separate or community property and the division of marital assets and debts between her and Clint A. Autrey (Husband). Wife contends that twenty-eighty of the district court's findings of fact are without supporting evidence in the record, and, that as a result, the district court erred in concluding that (1) the business started by the couple during the marriage, AJAC Enterprises, Inc. (AJAC), is

community property, rather than the separate property of Wife; (2) the rent allegedly charged and a loan allegedly made to AJAC by Wife's father and the company owned by him are Wife's separate debts; (3) Wife is not entitled to interim support; (4) Wife is not entitled to reimbursement for the gambling losses she alleged Husband incurred during the marriage and paid with community funds; and (5) the parties' Albuquerque residence (the Corona home) is an asset of a revocable trust and is therefore divisible marital property. With the exception of the court's finding that the Corona home was held in a revocable trust, and the court's conclusion that the home was, therefore, marital property, we hold that the district court's findings of fact are supported by substantial evidence and that the court correctly applied the law to its findings. With regard to the Corona home, we find that the Corona home was held in an irrevocable trust for the benefit of the parties' son, and was therefore not marital property. We affirm on all issues with the exception of the court's treatment of the Corona home as community property and remand for further proceedings consistent with this opinion.

## BACKGROUND

{2}     The parties were married on April 6, 1991. Their one child, Phoenix Autrey, was a minor at the time of trial, but turned eighteen in July 2019, just before the judgment was entered. Phoenix was not separately represented in the district court proceedings characterizing and dividing the parties' property. The district court determined it had jurisdiction over Phoenix at the time of trial, but not as of July 2019 when Phoenix reached the age of majority.

{3}     The parties separated in 2006. Wife petitioned for legal separation in 2006, but that petition was dismissed in 2007 for lack of prosecution. Husband and Wife remained married for ten more years, continuing to work together, but living apart until 2017, when Husband reopened the divorce case and filed a counterpetition for dissolution of marriage.

{4}     During the marriage, AJAC was a highly successful construction business that earned a sizeable income. The parties acquired substantial real property during the marriage, including two homes in New Mexico and a condominium in Arizona.

{5}     In 2002, with the assistance of legal counsel, the parties created three trusts: a Family Revocable Trust, and two identical irrevocable Qualified Personal Residential Trusts (QPRTs). Husband and Wife put the Corona home, their marital residence, into the QPRTs—the Audrey June Autrey Irrevocable Trust, and the Clint A. Autrey Irrevocable Trust.

{6}     The district court was asked to address the characterization and distribution of these assets, to address Wife's claim for interim support, and to consider whether gambling losses during the marriage paid with community property must be reimbursed to the community.

{7}     Following a three-day trial, where more than two hundred exhibits were admitted into evidence, both parties filed extensive proposed findings of fact and conclusions of

law. After considering both filings, the district court entered 141 findings of fact and 56 conclusions of law, along with a final decree of dissolution of marriage.

**{8}** Additional facts concerning each of the contested issues are detailed below to the extent necessary to our decision.

## DISCUSSION

**{9}** We note at the outset that in our review of the district court's findings of fact, we do not reweigh the evidence but instead decide whether each challenged finding was supported by substantial evidence, indulging every reasonable inference in favor of the district court's disposition. *Wisznia v. N.M. Hum. Servs. Dep't*, 1998-NMSC-011, ¶ 10, 125 N.M. 140, 958 P.2d 98. The testimony of a single witness, if found credible by the district court, is sufficient to constitute substantial evidence supporting a finding. *State v. Hamilton*, 2000-NMCA-063, ¶ 20, 129 N.M. 321, 6 P.3d 1043. "As a reviewing court we do not sit as a trier of fact; the district court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964. "[W]hen there is a conflict in the testimony, we defer to the trier of fact." *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33.

## I. The District Court Did Not Err in Determining That AJAC Was Community Property and Not Wife's Separate Property

**{10}** Wife argues that the district court erred by designating the parties' business, AJAC, as community property. Wife makes two arguments in support of her claim that AJAC is her separate property. First, although Wife admits that the business was started after the parties' marriage, Wife claims that it was funded solely with her separate property and retained its status as her separate property throughout the marriage. Wife next argues that, even if AJAC was funded with community property, Husband knowingly and intentionally waived his community interest in the business.

### A. Wife Failed to Rebut the Presumption That Property Acquired During Marriage Is Community Property

**{11}** The status of property acquired during a marriage is determined at the time the property is acquired and by the manner of its acquisition. *Bayer v. Bayer*, 1990-NMCA-106, ¶ 12, 110 N.M. 782, 800 P.2d 216. Property acquired by either or both spouses during their marriage is presumptively community property. NMSA 1978, § 40-3-12(A) (1973). The party seeking to establish such property as separate—in this case, Wife—has the burden of rebutting that presumption by a preponderance of the evidence. *Hodges v. Hodges*, 1984-NMSC-031, ¶ 6, 101 N.M. 67, 678 P.2d 695. The presumption can be rebutted by a showing that property acquired during marriage was acquired with a spouse's separate funds, as Wife attempted to show in the district court. *See* NMSA 1978, § 40-3-8(A)(4) (1990) (noting that property acquired by either spouse by gift is separate property). Such property generally retains its status as separate property even

if the other spouse later contributes funds or labor to that property. *Campbell v. Campbell*, 1957-NMSC-001, ¶ 80, 62 N.M. 330, 310 P.2d 266.

**{12}** Wife relies on these principles of law, claiming that because Husband did not specifically refute her testimony that AJAC was started with a $2,000 gift to her from her mother, the district court was required to find that AJAC was acquired with Wife's separate funds and remained her separate property throughout the marriage. The district court found, however, that Wife's testimony that AJAC was funded with a $2,000 gift from her mother was not credible, that Wife generally was not a credible witness, and the "vast majority of the evidence" supported AJAC being a community asset built during the marriage.

**{13}** "It is for the [district] court to weigh the testimony [and] determine the credibility of witnesses." *Lopez v. Adams*, 1993-NMCA-150, ¶ 2, 116 N.M. 757, 867 P.2d 427. "If a finding is made against the party with the burden of proof, we can affirm if it was rational for the [district] court to disbelieve the evidence offered by that party." *Id.* Our review of the record reveals evidence that supports the rationality of the district court's decision not to credit Wife's testimony about having received a $2,000 gift. Wife did not support her testimony with any documentation of the gift; the $2,000 amount alleged was unlikely to have been sufficient to fund the launch of a corporation engaged in heavy earth-moving; and undisputed evidence showed that Husband was involved from the outset in every aspect of creating and running the corporation. Even the name of the corporation reflected Husband's ownership interest. Husband testified AJAC stood for "A.J. and Clint," a combination of Wife's and Husband's names. Notably also, the district court finding that it was the parties' joint efforts, as joint owners and business partners, that made the business a success for many years, is not challenged on appeal. Given the evidence before the district court, we conclude that the district court did not err in refusing to credit Wife's unsupported and self-serving testimony that she started the business with a $2,000 gift.

**B.    Substantial Evidence Supports the District Court's Findings That Husband Did Not Intend to Waive His Community Property Interest in AJAC and That There Was No Consideration for Such a Waiver**

**{14}** Wife next claims that even if AJAC was funded with community property, as the district court found, Husband waived his community interest in the corporation, thereby transmuting AJAC into her separate property. Wife relies on incorporation documents filed with the State of New Mexico at the start of the business that names her as the sole shareholder of AJAC, together with shares of stock issued in her name and, in particular, a statement in the incorporation documents signed by Husband, waiving his community property rights.

**{15}** Although the district court acknowledged the terms of these incorporation documents, it found that they were not sufficient to establish that Husband had intentionally waived his entire ownership interest in the jointly founded and jointly run company that was the couple's life work, in light of Husband's testimony that he did not

understand that these documents would allow Wife to claim sole ownership of the company, and that, even if he did intend to give up his interest, there was no consideration for his waiver, as required by New Mexico law.

**{16}** The district court was correct that a waiver of a community property interest is effective only if the spouse signing the document understood that the spouse was giving up a significant community interest and intended to make that gift to the other spouse. *See Gabriele v. Gabriele*, 2018-NMCA-042, ¶ 21, 421 P.3d 828 (holding that clear and convincing evidence of a spouse's intent to transmute community property to the sole and separate property of the other spouse is required to overcome the presumption that property acquired during the marriage is community property).

**{17}** Wife argues that the signed incorporation documents show, on their face, that Husband understood he was giving up his ownership interest and that he intended to do so. Wife's argument minimizes Husband's testimony to the contrary. Husband testified that he signed the waiver to allow the company to qualify for a preference for women-owned companies in the award of government contracts and did not understand that Wife could subsequently claim that he had given up his community interest in the company. The testimony of a single witness constitutes substantial evidence if it is credited by the district court, as was Husband's testimony here. *See State v. Soliz*, 1969-NMCA-043, ¶ 8, 80 N.M. 297, 454 P.2d 779. We, therefore, reject Wife's claim that there is insufficient evidence in the record to support the district court's finding that Husband did not intend to give up his community interest in AJAC.

**{18}** We agree as well with the district court's conclusion of law that, to be enforceable in a divorce proceeding, a contract between spouses where one of them gives up a right to claim a community interest in an asset, effectively transmuting the property into the separate property of the other spouse, must be supported by consideration. *See Gilmore v. Gilmore*, 2010-NMCA-013, ¶ 27, 147 N.M. 625, 227 P.3d 115. Wife agrees that consideration is required and argues that Husband's consideration for giving her his interest in AJAC was his compensation for his duties as an officer and employee of AJAC. Such compensation, however, appears to have been consideration for work performed, not for his waiver of his community property interest. Moreover, the Court has held that the promise of at-will employment does not place any actual constraints on an employer's future conduct, and is, accordingly, an illusory promise that cannot serve as consideration. *Piano v. Premier Distrib. Co.*, 2005-NMCA-018, ¶¶ 8, 19, 137 N.M. 57, 107 P.3d 11 (holding that an arbitration agreement entered into by an employee in exchange for the "illusory promise" of continued at-will employment lacked consideration). Thus, to the extent that Wife argues that Husband's at-will employment at the company that he cofounded was consideration for his forfeiture of all ownership rights in that company, we are not persuaded. We will, therefore, not disturb the district court's conclusion that Wife failed to rebut the presumption that AJAC was community property.

**II.      The District Court's Findings Rejecting Wife's Claim That AJAC Was in Debt to Macchu Picchu, a Company Owned by Wife's Father, for Both Rent and Loan Repayment Were Supported by Substantial Evidence**

**{19}**    We next address Wife's arguments regarding debts allegedly owed by AJAC to Macchu Picchu, a company owned by Wife's father, Steven DeYapp. Macchu Picchu owned the building where AJAC's offices were located. Wife claimed at trial that AJAC owed Macchu Picchu substantial back rent, together with amounts due on a promissory note on a loan obtained by Macchu Picchu for the benefit of AJAC. Wife argues on appeal that, having determined that AJAC is community property, the district court was required to treat back-rent owed by AJAC and AJAC's debt on the promissory note as community debt. Wife seeks reversal of the district court's conclusion that, if AJAC has any debt for rent or on the promissory note, those amounts are Wife's separate debt.

**{20}**    Wife's argument is based on a misunderstanding of the district court's decision. The district court treated the amounts allegedly owed to Macchu Picchu as Wife's separate debt because the evidence failed to show either that these amounts were actually owed by AJAC, or that, if they were owed, they were legitimate debts that benefited the corporation, as opposed to gifts or personal loans from Wife's father, Steve DeYapp, to Wife.

**{21}**    The only evidence in the record showing these were actual debts was the testimony of Wife and Wife's father, Mr. DeYapp. Although Wife alleged that AJAC rented office space from Macchu Picchu for many years, Wife did not introduce into evidence either a rental agreement entered into by AJAC or documents verifying the rent paid, or the amount still unpaid. Mr. DeYapp gave conflicting testimony at trial as to whether AJAC owed any rent to Macchu Picchu and was unfamiliar with rental documents and unsure of the amount allegedly owed by AJAC each month. Mr. DeYapp also testified that he never expected AJAC to pay rent and that he would not charge AJAC rent if his daughter was experiencing financial difficulty. His testimony is sufficient to support the district court's finding that AJAC did not owe Macchu Picchu money for unpaid rent and that, if any money was owed, there was no evidence of benefit to the company rather than to Wife personally. We, therefore, find no error in the district court's characterization of rental debt, if any, as the separate debt of Wife.

**{22}**    With regard to the promissory note, Mr. DeYapp testified that Macchu Picchu had taken out a loan on the building AJAC occupied and lent the money to AJAC, entering into a promissory note with AJAC, signed by Mr. DeYapp and Wife, requiring AJAC to repay Macchu Picchu. The court found that there was no evidence of payments having been made by AJAC on the promissory note, though such payments had been due monthly since 2018. To the extent debt was actually owed, the district court again concluded that there was no evidence that this was a legitimate debt which benefited the corporation, as opposed to a gift or a loan from Wife's father, Mr. DeYapp, to Wife.

**{23}**    The district court was permitted to resolve the conflict in Mr. DeYapp's testimony concerning the existence of rental debt and to find Wife's and Mr. DeYapp's self-serving

testimony that AJAC was required to make the payments on Macchu Picchu's debt not credible. Wife had the burden to establish the existence of these debts. The district court, therefore, did not err in refusing to include these alleged, but unproven, debts in its list of community debt subject to division. We again find no basis for reversal.

### III. The District Court Acted Within Its Discretion With Regard to Interim Support

{24}    We next address Wife's arguments regarding interim support. On appeal, Wife claims that it was undisputed that she was entitled to at least $128,360 in interim support and that the district court's decision to deny her those funds was without support in the record.

{25}    The district court findings were based on the court's review of twenty-six interim worksheets Wife prepared and introduced into evidence. The district court reviewed the worksheets and found that Wife's calculation of her expenses during the course of the litigation, and her list of the community debts she had allegedly paid, were "not credible and lacked supporting evidence regarding payments of the community bills." The district court found, and this Court agrees, that the documents entered into evidence to support her request are "a series of bills without any evidence as to where the funds came from to pay the bills." Importantly, the district court found that the exhibits introduced by Wife did not reveal whether Wife was seeking repayment twice for payment of community debts: once as interim support, and again by listing the same debts as divisible community debt. The court concluded that if Wife had indeed used community credit cards to charge these interim costs, "requiring Husband to pay Wife interim [support] while also assuming half of the current . . . debt [on those cards] would be inequitable." The district court also found that Wife had taken advances on the parties' community funds to support herself during the pendency of the case, without clearly accounting for those funds and had imputed income to Husband, but not to herself.

{26}    Wife does not argue that the court's findings are without support in the record. Instead, she points to Husband's agreement that, under the court's temporary interim order, he would owe her approximately $128,000 in interim support and asks that this Court to enforce the interim order. That order, however, reserved authority to make a decision about interim support following a full hearing on the division of the parties' assets and debts. The district court, therefore, was not bound to implement the terms of that order and was free to consider the evidence of the parties' circumstances and the availability of community property for division. "Whether to order spousal support, how much to order, and the duration of the order are within the sound discretion of the district court." *Rabie v. Ogaki*, 1993-NMCA-096, ¶ 5, 116 N.M. 143, 860 P.2d 785. Wife has not shown that the district court's reasons for denying interim spousal support were either unreasonable or without support in the evidence. We see no abuse of discretion in the district court's decision to deny Wife retrospective interim support given both the accounting issues raised by Wife's exhibits and Wife's substantial income during the separation, which was to continue after the decree was entered. The district court did not abuse its discretion in choosing to equitably divide the parties' community debts and

assets, rather than awarding Wife interim support. We will, therefore, not disturb the district court's decision.

**IV.     The District Court's Conclusion That Wife Failed to Demonstrate That the Community Was Entitled to Reimbursement for Husband's Gambling Losses Incurred During the Marriage Is Supported by Substantial Evidence in the Record**

**{27}**     We next address Wife's argument that the district court erred in not requiring Husband to reimburse the community for Husband's gambling losses, which he incurred and paid with community funds during the marriage. Wife's argument assumes that she need only establish that the gambling losses were Husband's separate debt to support her claim that reimbursement of the community is required. We do not agree.

**{28}**     Although Wife challenges what she claims is the district court's finding that Husband's gambling losses were a community debt, the district court makes no such finding. The district court, instead, correctly concluded that even assuming the gambling losses were a separate debt, as provided by NMSA 1978, Section 40-3-9.1 (1997), whether the losses must be repaid to the community upon divorce depends on whether there was some special circumstance, such as breach of fiduciary duty to Wife by Husband or violation of a court order, so that the expenditure constituted waste of community assets. Otherwise, community funds once spent are not available assets subject to distribution in a divorce proceeding. *Irwin v. Irwin*, 1996-NMCA-007, ¶ 13, 121 N.M. 266, 910 P.2d 342 ("[O]nce community personal property or earnings are expended, . . . there is no community asset to be shared or managed, and the spouse making the expenditure has no duty to reimburse the community absent some special circumstance such as violation of a court order or breach of a fiduciary duty to the other spouse.").

**{29}**     In the context of a gift by one spouse of substantial community property to a third party, without the knowledge or consent of the other spouse and in contemplation of divorce, our Supreme Court adopted the following rule to guide when repayment to the community is required:

> (1) [E]ach spouse has the power to manage and dispose of the community's personal property;
>
> (2) subject to a fiduciary duty to the other spouse; and
>
> (3) absent intervening equities, a gift of substantial community property to a third person without the other spouse's consent may be revoked and set aside for the benefit of the aggrieved spouse.

*Roselli v. Rio Cmtys. Serv. Station, Inc.*, 1990-NMSC-018, ¶ 23, 109 N.M. 509, 787 P.2d 428. Payment to a creditor by one spouse of a separate debt with community property is subject to the same rules. *See Fernandez v. Fernandez*, 1991-NMCA-001, ¶¶ 11-12, 111 N.M. 442, 806 P.2d 582 (relying on *Roselli* to require a spouse to repay

money paid to a creditor with community property without the consent of the other spouse and in violation of the fiduciary duty owed by one spouse to another).

**{30}** The question on appeal, therefore, is whether the district court's conclusion that there was no waste of community property occasioned by payment during the marriage of Husband's gambling losses is supported by substantial evidence. Wife relies on the amount paid over the years (allegedly $240,000), and on her own testimony that "she was not aware of [Husband] writing checks from AJAC to pay for his gambling debts" to claim that the district court's decision was without support in the record.

**{31}** We conclude that substantial evidence supports the district court's conclusion that Wife failed to establish that Husband used community funds to pay for his gambling losses without her agreement, or that the amount of Husband's losses was $240,000, rather than being offset by gains. The record shows that Husband agreed in his testimony that he went on several gambling trips during the years he and Wife were married and were living together. He testified that Wife accompanied him on those trips and also gambled. Husband testified that while they sometimes incurred substantial losses, they also won substantial amounts, which offset those losses. Husband testified that Wife at one point told him that a safe deposit box they jointly controlled contained over $600,000 in cash from gambling wins. Wife did not contradict this testimony. It was undisputed that the losses were paid with checks by AJAC, the parties' joint business. In sum, although the record is uncontroverted that gambling occurred during the marriage, Wife put forward no evidence other than her own testimony as to the amount of the net losses, that those losses were solely attributable to Husband's gambling and not Wife's gambling as well, and that she was unaware that the losses were paid by AJAC with community funds. We again defer to the district court's finding that Wife's testimony was not credible, and therefore agree with the district court that there was no evidence in the record that established the essential elements of a breach of fiduciary duty, a lack of consent by Wife, or even the amount of the separate debt, necessary to establish a right to reimbursement.

### V. The District Court Erred in Finding That the Corona Home Was in a Revocable Trust and in Characterizing It as Community Property

**{32}** We note at the outset that the evidence of the terms of the various trusts created by the parties was entirely documentary. Where evidence is entirely documentary, the appellate court "is in as good a position as the trial court to determine the facts and draw its own conclusions." *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 13, 303 P.3d 814 (internal quotation marks and citation omitted). We therefore review the questions concerning the disposition of the parties' QPRTs and the Autrey Revocable Trust de novo.

**{33}** In 2002, with the assistance of legal counsel, Husband and Wife established three trusts: the Autrey Revocable Trust, the Audrey J. Autrey Qualified Personal Residence Trust, and the Clint A. Autrey Qualified Personal Residence Trust. Husband

and Wife transferred each of their interests in the Corona home, then the family residence, into their respective QPRTs.

**{34}**     The parties' QPRTs are, by their terms, irrevocable trusts. A QPRT is a type of trust authorized by federal tax law as a way to transfer a residence to family members, usually to the children, without paying gift or estate tax. *See* 26 U.S.C. § 2702(a)(3)(A)(ii); 26 C.F.R. § 25.2702-5(a)(1) (2022). Husband and Wife each testified that they formed the QPRTs with the intent of ensuring that their home was protected for their son, Phoenix.

**{35}**     For the first ten years of the trusts' existence, Husband and Wife, according to the terms of the trusts, had the right "to use and occupy the residence as a personal residence" and the right to receive any income from the trusts. Upon the expiration of the original period of ten years, the beneficial interest in the Corona home was transferred to the parties' only child, to be managed in a fiduciary capacity by the trustees. During Phoenix's minority, the home could be used by Husband and Wife for Phoenix's benefit and for their incidental benefit as his caretakers as well. When, however, Phoenix attained the age of majority, the Corona home was required to be held by the trustees for his sole benefit. Distributions of property, or earnings from rent or other use of the home are to be made to meet Phoenix's needs, at the discretion of the trustees. Husband was the trustee of his trust and Wife the trustee of her trust. The assets of the trusts need not be distributed in whole until Phoenix's death, in the discretion of the trustees based on Phoenix's needs.

**{36}**     The trusts were created in 2002; the initial ten-year period expired in 2012 when Phoenix was eleven years old. Wife continued to live in the home while Phoenix remained a minor, a use permitted by the trust documents. Phoenix attained the age of majority in July 2019, after the divorce hearing, but before judgment was entered.

**{37}**     The parties introduced into evidence both the Autrey Revocable Trust and the two QPRTs. The documents were authenticated by Vickie Wilcox, the attorney who drafted the trusts. Ms. Wilcox testified that the Corona home had been transferred to the parties' QPRTs, and the district court admitted the deeds showing the transfer to the trusts into evidence. Ms. Wilcox did not testify as an expert, and the district court relied on its own review of the trust documents.

**{38}**     Following trial, the district court adopted verbatim Husband's proposed findings as to the Corona home. The court found that the Corona home was "[t]he only asset in the trust identified in Exhibit 31," the Autrey Revocable Trust. The court further found that "[n]either party testified that the Autrey Revocable Trust could not be revoked." Relying on these findings, the district court held that the Corona home is community property, and distributed the Corona home to Wife. The court also revoked all of the parties' trusts in its final decree.

**{39}**     We agree with Wife that the district court's finding that the Corona home was held in the revocable Autrey Trust is not supported by substantial evidence in the

record. The district court's finding appears to be a mistake. The testimony of Ms. Wilcox and the documents in evidence conclusively establish that the Corona home is an asset of the parties' *irrevocable* QPRTs, and not of the Autrey *Revocable* Trust. The court's findings are therefore not supported by substantial evidence in the record and "may not be sustained on appeal." *Hertz v. Hertz*, 1983-NMSC-004, ¶ 23, 99 N.M. 320, 657 P.2d 1169.

**{40}** Husband invites us to affirm the district court's decision that the Corona home is community property under the "right for any reason" doctrine. *See State v. Gallegos*, 2007-NMSC-007, ¶ 26, 141 N.M. 185, 152 P.3d 828 ("[W]e will affirm the trial court's decision if it was right for any reason so long as it is not unfair to the appellant for us to do so."). Husband urges this Court to conclude that it would be inequitable to not revoke the QPRTs because the gift and estate tax benefits are no longer useful to Husband and Wife given their changed financial circumstances, and by revoking the QPRTs, more property would be available to the community.

**{41}** We decline Husband's invitation to decide this issue under our "right for any reason doctrine." Husband's argument that the district court in a divorce case can exercise its equitable powers to divide property held in an irrevocable trust has been rejected by this Court in *Vanderlugt v. Vanderlugt*, 2018-NMCA-073, ¶ 21, 429 P.3d 1269. *Vanderlugt* holds that although property held in a revocable trust is considered marital property subject to division because the settlor spouse can revoke the trust and thus continues to own the property, the same cannot be said for an irrevocable trust. *Id.* ¶¶ 15-16. The equitable interest in the trust property belongs to the beneficiary of an irrevocable trust and cannot be modified by the settlor.

**{42}** In this case, at the time of the divorce, the full equitable interest in the Corona home had vested in Phoenix. Although Husband and Wife retained some control of the property as trustee of their respective QPRT, this is not an ownership interest: they are bound by fiduciary duty to protect and use the trust assets solely for the benefit of Phoenix. There is, therefore, no beneficial community interest to divide. *See id.* ¶ 16.

**{43}** To the extent Husband is arguing that the district court had the authority to revoke the QPRTs, even if Husband and Wife do not, we do not agree. Our Supreme Court held in *Oldham v. Oldham* that revocation of an irrevocable trust can be accomplished only pursuant to the provisions of the Uniform Trust Code (UTC). 2011-NMSC-007, ¶ 15, 149 N.M. 215, 247 P.3d 736 ("Revocation of wills and trusts is governed by mandatory statutes. We must honor legislative intent that wills and trusts be revoked in strict accordance with the statutory methods and formalities established by the . . . UTC."). Pursuant to the UTC, revocation of an irrevocable trust cannot be accomplished without the agreement of the beneficiary, together with other specific conditions. *See* NMSA 1978, §§ 46A-4-410 (2003), -411 (2007). Phoenix, the beneficiary of the trust, was not joined in this proceeding, and revocation of the trust was, therefore, not permissible under the UTC. It was therefore error for the district court to revoke the QPRTs.

**{44}** Our decision is without prejudice to any claim that Husband may assert to seek modification or termination of the QPRTs in a proceeding where all parties are joined. We express no opinion on the merits of such a challenge.

**CONCLUSION**

**{45}** We reverse solely with respect to Wife's claim of error regarding the treatment of the Corona home as community property and the revocation by the court of the irrevocable QPRTs. In all other respects, we affirm. We remand to the district court to address, in the exercise of its discretion, the change in the value of the couple's community assets required by the restoration of the Corona home to the irrevocable QPRTs.

**{46}    IT IS SO ORDERED.**

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**JACQUELINE R. MEDINA, Judge**