529 P.2d 1239

**CO–CON, INC., Petitioner-Appellant,**

v.

**BUREAU OF REVENUE, Respondent-Appellee.**

**UNIVERSAL CONSTRUCTORS, INC., Petitioner-Appellant,**

v.

**BUREAU OF REVENUE, Respondent-Appellee.**

**No. 1335.**

Court of Appeals of New Mexico.

Nov. 13, 1974.

Rehearing Denied Nov. 21, 1974.

Certiorari Denied Dec. 20, 1974.

**120**

Joe R. G. Fulcher, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for petitioners-appellants.

David L. Norvell, Atty. Gen., Santa Fe, Susan P. Graber, Vernon O. Henning, Bureau of Revenue Asst. Attys. Gen., for respondent-appellee.

## OPINION

LOPEZ, Judge.

Taxpayers, Co-Con, Inc. and Universal Constructors, Inc. appeal from a decision and order of the commissioner of revenue denying their protests concerning various assessments of gross receipts and compensating tax and penalties. We affirm in part, reverse in part, and remand in part with instructions.

There are five points for consideration:

(1) *Gross Receipts on Leases.* During the periods under question, items of construction equipment common to the operations of both corporations were utilized by both on their construction projects without regard to which corporation held legal title to the equipment. Co-Con, Inc. is a 100% owned subsidiary of Universal Constructors, Inc. Based on this usage, entries were made in the accounting records of each taxpayer estimating the cost of usage of the equipment. The commissioner held that the amounts recorded represented rental income from the lease of equipment and assessed gross receipts tax on each pursuant to § 72–16A–4, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973).

(2) *Compensating Tax on Purchases from Safety Flare, Inc.* Taxpayer Co-Con, Inc. contracted with Safety Flare, Inc. for certain services. A non-taxable

transaction certificate (NTTC) was issued by Co-Con, Inc. The commissioner held the NTTC invalid and assessed the taxpayer for compensating tax.

(3) *Gross Receipts Tax on Additional Receipts from D. W. Falls, Inc.* Taxpayer Universal Constructors, Inc. performed a project for D. W. Falls, Inc., on completion of which taxpayer accepted a secured promissory note in lieu of final payment. The commissioner characterized the note as a "time-price differential sale" and assessed a gross receipts tax on the interest paid with the note pursuant to § 72–16A–3(F), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973).

(4) *Rio Arriba County Gross Receipts Tax.* Taxpayer Universal Constructors, Inc. paid gross receipts tax to the state for its receipts on the Heron Dam project but did not pay a similar county tax. The commissioner assessed a gross receipts tax on behalf of Rio Arriba County pursuant to a county ordinance.

(5) *Penalties.* On all of the above assessments the commissioner assessed penalties of 10% of the tax due pursuant to § 72–13–82(A), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973).

We resolve the conflicts in these situations seriatim:

(1) Taxpayers protest the assessments of their mutual utilization of equipment, stating that they did not receive gross receipts, or in the alternative, that any consideration received was either exempt from taxation or eligible for a deduction from taxable receipts or was less than that computed by the commissioner.

Taxpayers argue that the accounting entries reflecting this utilization were merely cost analyses and were in no way supported by any agreement for mutual reimbursement. By this interpretation, taxpayers seek to avoid the impact of § 72–16A–3(F), supra, which reads in pertinent part as follows:

"F. 'gross receipts' means the total amount of money or the value of *other consideration,* received from selling property in New Mexico, from *leasing* property employed in New Mexico or from performing services in New Mexico, * * *." [Emphasis supplied].

■ Leasing is defined for purposes of gross receipts taxation in § 72–16A–3(J), N.M.S.A.1953 (Rep.Vol. 10, pt. 2, Supp. 1973).

"J. 'leasing' means any arrangement whereby, for a consideration, property is employed for or by any person other than the owner of the property; * * *."

The characterization of a transaction as a lease may also be determined by looking to the intentions of the parties as evidenced by their actions with respect to the leased property. Transamerica Leasing Corp. v. Bureau of Revenue, 80 N.M. 48, 450 P.2d 934 (Ct.App.1969).

■ Under the applicable definition, the value of consideration received for leasing the equipment in question was the right to use such equipment. It should be noted at this point that the consolidation of these taxpayers' appeals was purely a matter of convenience and efficiency in procedure. Each transaction and taxpayer must be considered separately for purposes of determining taxability as though only one taxpayer at a time were before the court. Each transferor of construction equipment in the case at bar made accounting entries showing the machinery as "receivable" while each transferee entered the equipment as "liability." Although this fact, taken by itself, might do no more than support taxpayers' claim that the entries were mere cost analyses, the accompanying treatment by both companies of the transactions as gross rentals for federal corporate income tax purposes in the same tax year indicates that the intent of the taxpayers was to treat the arrangements as rentals or leases. Taxpayers must treat transactions uniformly for all purposes within the tax scheme and not attempt to show, first, a lease for federal purposes and second, a non-taxable event for state

purposes. We find ample evidence in the record to indicate that taxpayers engaged in leasing, both by intent and within the scope of the statutory definition.

■■ Taxpayers' remaining arguments with respect to this first point are equally unpersuasive. They state that the joint use of equipment may not be termed a lease because the shareholders of Universal Constructors, Inc. own all the equipment in question. As stated before, these two corporations must be treated as separate entities for taxation purposes. House of Carpets, Inc. v. Bureau of Revenue, 84 N.M. 747, 507 P.2d 1078 (Ct.App.1973). Taxpayers cannot hide behind their shareholders in an effort to escape corporate liability.

■ The consideration for these leases may not be termed either a contribution to capital by the lender or a dividend on capital stock by the lessee. There is no evidence of a dividend or capital contribution on the record; and there is no showing of entitlement to the exemption [§ 72–16A–12.13, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973)] claimed by taxpayers on appeal. Rock v. Commissioner of Revenue, 83 N.M. 478, 493 P.2d 963 (Ct.App.1972).

■ The taxpayers further contend that the amounts assessed by the commissioner for these leases are excessive. The record shows that the bureau used the admittedly conservative figures of the taxpayers in order to arrive at the value of these gross receipts. Taxpayers are in error in their understanding of the use of their values of consideration by the bureau. The commissioner has determined that the amount of gross receipts is the value received by the lessor or transferor of the equipment. The gross receipts tax is levied upon the lessor of equipment, not the user as taxpayers would have us hold. Section 72–16A–3(F), supra.

■ As a final contention under this first conflict, taxpayers argue that their leases should be exempt from the gross receipts tax under § 72–16A–14.26, N.M.S.A.

1953 (Repl.Vol. 10, pt. 2, Supp.1973) which exempts receipts from joint use by a corporation and/or its subsidiary of office machines and facilities. This section is purely exclusionary and limited to machines of a general administrative nature. The heavy construction equipment exchanged by taxpayers in no way qualifies for this exemption.

In summary, then, we resolve the first point adversely to the taxpayers by finding that they did receive gross receipts from the leasing of equipment, that the consideration received was in no way exempt from taxation pursuant to § 72–16A–4, supra, and that the amount subject to gross receipts tax, as computed by the bureau, was the proper taxable figure.

(2) The bureau has conceded the nontaxability of this transaction. The tax, penalty and interest relating to this issue will be abated in full by the commissioner of revenue. Leaco Rural Telephone Cooperative, Inc. v. Bureau of Revenue, 86 N.M. 629, 526 P.2d 426 (Ct.App.1974).

(3) The taxpayer contends that the additional money received from D. W. Falls, Inc. for services performed was in the form of interest and should be exempt from taxation by the bureau pursuant to § 72–16A–12.13, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973). The commissioner argues that the additional money must be viewed as a "time-price differential sale" and is therefore taxable under § 72–16A–3(F), supra. We will not discuss the applicability of § 72–16A–12.13, supra, since we view the issue to be the applicability of the tax sought to be imposed under § 72–16A–3(F), supra, and § 72–16A–4, supra, rather than any arguable exemption from that tax.

The record shows that the arrangement for a promissory note, secured by a mortgage, given by D. W. Falls, Inc. to Universal Constructors, Inc. in payment for services rendered came through the initiation of D. W. Falls, Inc. Uncontradicted testimony by the secretary-treasurer of the taxpayer shows that the note was given and

accepted as an interest bearing instrument after all work had been completed by taxpayer:

"Q. Now, at the time you entered into the contract, you did not contemplate any type of time price differentials, that term is used in the Statute?

"A. That is correct.

"* * *

"Q. Mr. Leder, in connection with that note, at the time of the note and mortgage was received, had all the work been done by Universal?

"A. Yes.

"Q. And, it had been fully billed out?

"A. Yes.

"Q. And, I think the face of the note is down to the penny on the amount of the last—or is it the same number as the amount of the last invoice, is that correct?

"A. That is correct.

"Q. And, you testified earlier that that number could not have been determined until the job was completed because the job was bid and the work was done on a unit-price basis of at least three periods of the contract?

"A. . That is correct.

"* * *

"MR. SAUNDERS: May I add one more question to that? Were all of these, the note and the mortgage, were these prepared following the date of the last invoice regardless of the date shown on them?

"MR. LEDER: Yes they were.

"MR. SAUNDERS: And, they were executed after that date?

"MR. LEDER: Afterwards, yes."

█ In order to be taxable as a "time-price differential sale", the money in question must have been bargained for before the contract work was rendered and the final invoice delivered. A subsequent service charge is not part of a "time-price." Interest cannot be part of a "time-price" unless it is contracted for. Field Enterprises Educational Corporation v. Commissioner of Revenue, 82 N.M. 24, 474 P.2d 510 (Ct.App.1970); see Davis v. Commissioner of Revenue, 83 N.M. 152, 489 P.2d 660 (Ct.App.1971).

█ Under the commissioner's rationale, all interest paid upon a note to liquidate a debt for services rendered would necessarily have to be categorized as part of a "time-price" sale. This is clearly not the meaning of "time-price differential sale", and such words will be given their ordinary meaning unless a different legislative intent is clearly indicated. Davis v. Commissioner of Revenue, supra. The additional money paid on the note from D. W. Falls, Inc. to taxpayer was in the nature of interest and may not be characterized as "time-price" for the purposes of § 72–16A–3(F), supra. The tax as imposed by the bureau is inapplicable and we reverse the bureau on this issue.

(4) Taxpayer has challenged the imposition of a county gross receipts tax, raising issues of federal and state constitutionality and statutory construction. We decline to reach the constitutional issues presented in order to remand this particular area of conflict for further consideration by the bureau.

█ The taxpayer urges us to find that the Rio Arriba County gross receipts tax does not reach the gross receipts which taxpayer received from the Heron Dam project in that county. The commissioner argues that the taxpayer cannot raise the issue of applicability of the tax on appeal since it was allegedly not raised below. Section 72–13–39(A), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973); House of Carpets, Inc. v. Bureau of Revenue, supra. Taxpayer has submitted a Memorandum of Positions in which the issue of applicability of the county tax is timely raised. This memorandum was properly included as part of the record both through permission of the bureau and by order of this court (April 3, 1974). The issue of statutory

construction is, therefore, properly before this court on appeal.

Under § 72–13–39(D)(3), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973) this court shall set aside a decision and order of the commissioner if it is found to be not in accordance with law. The decision and order of the commissioner in this case declares simply that the taxpayer "is liable for Rio Arriba County tax upon its gross receipts derived from the Heron Dam project, 4 U.S.C. §§ 104–110." As stated above, we are not concerned with the constitutional issue raised before the bureau; we cannot be until we know something about the statute which is challenged. There is nowhere in the record any indication that the ordinance in question even exists.

█ Section 72–13–32(C), N.M.S.A. 1953 (Repl.Vol. 10, pt. 2, Supp.1973) states:

"C. Any assessment of taxes made by the bureau is presumed to be correct."

McConnell v. State ex rel. Bureau of Revenue, 83 N.M. 386, 492 P.2d 1003 (Ct.App. 1971) indicates, however, that this presumption need be overcome only by a taxpayer's disputing the factual correctness of an assessment. This the taxpayer has done by challenging the bureau's interpretation of the county ordinance in its Memorandum of Positions. Since no one is in a better position to demonstrate the contents of a tax statute than the bureau, the burden was properly shifted by the memorandum to the bureau to at least acknowledge the existence of the Rio Arriba County gross receipts tax ordinance.

█ Whether the bureau's assessment in this instance was in conformity with law is beyond the recitation of the record. Since our review must be based upon this record, § 72–13–39(A), supra, we find it impossible to proceed without some knowledge of the considerations underlying the bureau's action on this issue. For this reason, this particular matter must be remanded to the bureau for further proceedings so that the record will indicate the reasoning of the bureau and the basis on which it denied the taxpayer's protest. Title Services, Inc. v. Commissioner of Revenue, 86 N.M. 128, 520 P.2d 284 (Ct.App.1974).

(5) Taxpayers protest the penalties assessed by the commissioner pursuant to § 72–13–82(A), supra. The bureau asserts the general proposition that a presumption of correctness attaches to all its assessments. Section 72–13–32(C), supra; McConnell v. State ex rel. Bureau of Revenue, supra; see also § 72–16A–5, N.M.S. A.1953 (Repl.Vol. 10, pt. 2, Supp.1973).

Taxpayers contend that § 72–13–82(A), supra, should not be so read as to impose a per se liability upon all protesting taxpayers. The commissioner asks us to construe the section in such a way that a penalty is due any time a tax is due. This interpretation overly extends the scope of this section and attributes meaning to the words of subsection (a) which are not clearly indicated. Davis v. Commissioner of Revenue, supra.

█ The statute provides that the 10% penalty shall be added to the amount owed only in the event of failure to pay an assessed amount "due to negligence or disregard of rules and regulations." Section 72–13–82(A), supra. The diligent protest of all these issues by taxpayers negates the possibility of any negligence on their parts. Further, the taxpayers have not disregarded any rules and regulations. They have carried forward a thorough protest against the rulings of the commissioner with reasonable doubt as to the interpretation and applicability of the various taxes sought to be imposed by the order of the commissioner. Any presumptions of correctness which may have attached to the commissioner's decision have been sufficiently overcome by the taxpayers' showing that the bureau in at least one instance above (Point 2) failed to follow the statutory provisions of the tax act and by taxpayers' presenting evidence in all other instances to dispute the factual correctness of the

commissioner's assessments. McConnell v. State ex rel. Bureau of Revenue, supra; see Archuleta v. O'Cheskey, 84 N.M. 428, 504 P.2d 638 (Ct.App.1972). This series of disputes involved at times very complex and difficult legal issues; the taxpayers at all times had reason to believe that they would prevail, as they have in over half of the contentions raised. In no way can we conclude from these circumstances that the commissioner's assessments were not paid through taxpayers' negligence or disregard of the rules and regulations. Any other reading of § 72–13–82(A), supra, would render the qualifications "negligence" and "disregard" utterly meaningless. The decision of the commissioner to assess penalties pursuant to § 72–13–82(A), supra, was not in accordance with law and is reversed in its entirety.

In summary, therefore, the decision and order of the commissioner with respect to (Point 1), *Gross Receipts on Leases,* supra, is affirmed. The decision and order of the commissioner with respect to (Point 4), *Rio Arriba County Gross Receipts Tax,* supra, is reversed and the cause remanded to the commissioner for further proceedings consistent with this opinion. The decision and order of the commissioner with respect to (Points 2), *Compensating Tax on Purchases from Safety Flare, Inc.,* supra, (3), *Gross Receipts Tax on Additional Receipts from D. W. Falls, Inc.,* supra, and (5), *Penalties,* supra, are hereby reversed.

It is so ordered.

HERNANDEZ, J., concurs.

SUTIN, Judge (dissenting).

I dissent.

I dissent on Point 1, which affirms the Decision and Order of the Commissioner with respect to gross receipts on leases. The Commissioner's written Decision and Order is (1) arbitrary, capricious and an abuse of discretion; (2) not supported by substantial evidence in the record; and (3) not in accordance with law. Section 72– 13–39(D), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, 1973 Supp.).

(1) *To find an equipment leasing arrangement between Universal and Co-Con disregards equitable principles and strains the public conscience.*

The Commissioner's Decision and Order made the following conclusion:

2. Amounts attributable to *equipment transactions* between the taxpayers constitute gross receipts of each taxpayer within the meaning of § 72–16A–3(F), N.M.S.A.1953 (Supp.1969 and Supp. 1971) [being Laws 1966, ch. 47, § 3]. [Emphasis added.]

Section 72–16A–3(F), (J) and (K) says:

F. "gross receipts" means the total amount of money or the value of *other consideration,* received * * * from *leasing property employed in New Mexico * * *.*

J. "leasing" means any arrangement whereby, *for a consideration,* property is employed for or by any person *other than the owner of the property;*

K. "service" means all activities engaged in for other persons *for a consideration,* which activities involve primarily *the performance of a service* as distinguished from selling property; [Emphasis added.]

Co-Con is a 100%-owned subsidiary of Universal Constructors, Inc. Each entity has paid all of its gross receipts tax on its operations. All of the equipment, regardless of legal title, is owned by Universal. To declare that Universal had a "lease" with itself, by virtue of allocations of its equipment between itself and its wholly-owned subsidiary, extorts taxes like a pickpocket. In the field of taxation, government agencies deliberately avoid principles of equity. "Equity seeks to do justice and avoid injustice, and is not bound by strict common-law rules." 30 C.J.S. Equity § 89 at 974. Administrative agencies are quasi-judicial bodies when they sit as boards of review, and they should seek to do justice and avoid injustice the same as judicial tribunals.

In the field of taxation, government agencies often avoid maxims of equity in order to collect money, show good results, and please the government. This is accomplished by settlement and litigation. These agencies close their eyes to equitable doctrines in interpretation of statutes and facts, not allowing equity to use its extraordinary powers so that justice may be done in each individual case. Pugh v. Phelps, 37 N.M. 126, 19 P.2d 315 (1932). A review of the law of taxation shows a complete absence of equity as a doctrine of decision. The Commissioner, or, as in this case, his deputy, is both the judge and attorney for the administrative agency.

Ofttimes, in order to affirm administrative rulings which would not otherwise withstand the hard light of legal reasoning, courts must resort to "legal fictions". This is true here, where there is a parent-subsidiary relationship. To call the arrangement that existed here a lease is to make use of a fiction. The corporate relationship in this case can be analogized with a father-son relationship. To tax a father and son for the use of each of the other's clothes in common projects would strain the conscience of the public. Analogously, to tax Universal and Co-Con for the use by each of the other's equipment, in common projects, strains the public conscience.

(2) *These equipment exchanges lack the essential elements of a contract. Therefore there was no lease.*

In Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926), Justice Cardozo said:

The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an "alias" or a "dummy." All this is well enough if the pictur-

esqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation.

What is the act of operation between Universal and Co-Con? The two corporations are engaged in related types of construction business, utilize similar types of equipment, and have overlapping management structures. Items of construction equipment common to the operations of both corporations were utilized by both corporations on their construction projects without regard to which corporation held legal title to the equipment.

Based upon accounting entries which estimated the cost of usage of the equipment of each corporation, the Commissioner held that the amounts recorded represented rental income from lease of equipment; and he upheld assessment of a gross receipts tax of $16,330.22 against Universal, and one of $6,445.25 against Co-Con.

However, no payment was made by either corporation to the other for such equipment usage, and there is no evidence of any intention to make any payment of money. There was no plan or agreement to exchange use of one's equipment for use of the other's equipment. The equipment exchange simply reflected economical and efficient operating procedures by the parent and subsidiary corporations.

There was no lease agreement or transaction between Universal and Co-Con. There was no consideration for the intercorporate use of equipment. The equipment was not "employed for or by any person other than the owner of the property".

There was no contractual arrangement between these two corporations. *"It is essential for the formation of a lease* that all the essentials of a contract must be present. The very first requisite is that there must be a meeting of the minds—an offer, and an acceptance of the terms of that offer." [Emphasis added.] First Nat. Bank in Albuquerque v. Tanney, 51 N.M. 60, 62, 178 P.2d 581, 582 (1947); Hoke v. Brown, 79 N.M. 682, 448 P.2d 483 (1968); 51C C.J.S. Landlord and Tenant,

§ 203 at 531. Here, there was no offer; no acceptance; no contract.

   (3) *No consideration passed between the parties. Therefore there was no lease.*

The Bureau of Revenue has published a definition of "consideration", upon which it relies in this case. It is as follows:

"Consideration" is any benefit, interest, gain or advantage to one party, usually the seller, or any detriment, forbearance, prejudice, inconvenience, disadvantage, loss, or responsibility, act or service given, suffered, or undertaken by the other party, usually the buyer. G.R. Regulation 3(B)–1.

This definition of "consideration" governs implementation of the "gross receipts" tax in this case. Section 72–13–23(G), N.M. S.A.1953 (Repl.Vol. 10, pt. 2, 1973 Supp.).

The plain language of § 72–16A–3(F) indicates that for these equipment usages to be subject to gross receipts tax, "consideration [must have been] received from leasing [the equipment]". It is obvious from a reading of this section that the "consideration" must have been "received" *by the company that owned the equipment* and gave use of it (i. e., leased it) to the other company. According to the Bureau's regulation defining "consideration", this means that the company *which owns the equipment* in a given exchange must receive "benefit, interest, gain, or advantage" in return for giving use of the equipment to the other company, *or else* the company *which gets use of the equipment* must suffer "detriment, forbearance, prejudice, inconvenience or disadvantage, [etc.]" in return for getting use of the equipment.

There is not one shred of evidence in the record to indicate that "consideration", as defined above, was an element in these equipment exchanges. In its brief on appeal, the Bureau offers no proof to show that there was "consideration". What the Bureau does, instead, is to distort its own definition of "consideration" to fit the facts of this case.

In support of its claim that there was "consideration", the Bureau makes the following assertions (given here with my own answers to these assertions):

   (1) " . . . there is ample evidence to support a finding of mutuality of valuable promises, constituting consideration." Answer Brief, at 3.

*Answer to (1)*: There is no evidence that any promises between Universal and Co-Con induced the intercorporate exchange of equipment. In any case, "mutuality of valuable promises", whatever that means, does not at all conform to the definition of "consideration" given by the regulation.

   (2) "Because the lease arrangement was reciprocal, each company received a benefit without the need for money to exchange hands. Each, in turn, bore a detriment when it gave up for a time the right to use its own equipment." Answer Brief, at 4.

*Answer to (2)*: According to the regulation defining "consideration", a benefit must go *to the party that owns the equipment,* or else, a detriment must be suffered by *the party that gets use of the equipment,* in order for there to be "consideration". The exact opposite set of circumstances is argued by the Bureau here.

   (3) "Giving up the right, for a time, to possess and use one's own property is detriment. Receiving in return the right to possess and use someone else's property is a benefit." Answer Brief, at 4.

*Answer to (3)*: Same as to (2), supra.

   (4) "Further evidence of the existence of consideration is found in the regularly kept books and records of the taxpayers themselves. * * * In each instance, the company owning the equipment reflects the transaction as a *receivable*. (The non-owning company reflects the transaction, its use of someone else's property, as a *liability* on its books.)" Answer Brief, at 5.

*Answer to (4)*: As the testimony at trial clearly shows, the accounting records and

**128**

tax records of the two companies do not reflect the existence of any consideration. Rather, they are evidence of cost accounting allocations, each company keeping proper account in its books of the allocations of its equipment.

In short, the language of the statute and of the governing regulation defining "consideration" is plain. The Commissioner has twisted that language in order to find a lease in a situation in which one simply does not exist. The arguments constructed by the Commissioner to justify a tax upon taxpayers' use of each other's equipment is mindful of an earlier, Biblical structure:

> Therefore is the name of it called Babel; because the Lord did there confound the language of all the earth. Genesis, 11:9.

The Decision and Order of the Commissioner is arbitrary and capricious; it is not supported by the evidence in the record; and it is not in accordance with law. It should be reversed.