The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>May 16, 2023</u>

**No. A-1-CA-38779**

**PROCESS EQUIPMENT & SERVICE COMPANY, INC.,**

     Protestant-Appellee,

v.

**NEW MEXICO TAXATION REVENUE DEPARTMENT,**

     Respondent-Appellant,

**IN THE MATTER OF THE PROTEST OF
THE DENIAL OF REFUND ISSUED
UNDER LETTER ID NO. L0040880432.**

**APPEAL FROM THE ADMINISTRATIVE HEARING OFFICE
Brian Van Denzen, Hearing Officer**

Gallagher & Kennedy, P.A.
Gene F. Creely, II
Frank V. Crociata
Santa Fe, NM

Spencer Fane, LLP
Scott Woody
Phoenix, AZ

for Appellee

Raúl Torrez, Attorney General
David E. Mittle, Special Assistant Attorney General
Santa Fe, NM

for Appellant

**OPINION**

**BACA, Judge.**

{1}     Process Equipment & Service Company, Inc. (PESCO) sought a state tax credit for the 2014 and 2016 tax years under the Technology Jobs and Research and Development Tax Credit Act (the Act), NMSA 1978, §§ 7-9F-1 through 7-9F-13 (2000, as amended through 2019). The New Mexico Taxation and Revenue Department (TRD) denied PESCO's applications for these tax credits. PESCO protested TRD's denial, and an independent administrative hearing was held before Chief Hearing Officer (CHO) of the Administrative Hearing Office (AHO). Following the hearing, the CHO concluded that PESCO met the requirements for a tax credit under the Act for both years. On appeal, TRD argues that PESCO did not satisfy the statutory requirements for entitlement to the credit because PESCO failed to (1) use a cost accounting methodology to allocate wages, and (2) use the same cost accounting methodology in its other business activities. *See* § 7-9F-3(G) (requiring that "[i]f a 'qualified expenditure' is an allocation of an expenditure, the cost accounting methodology used for the allocation of the expenditure shall be the same cost accounting methodology used by the taxpayer in its other business activities"). For the reasons that follow, we affirm.

## BACKGROUND

{2}      PESCO designs and manufactures unique products for use in the oil and gas industry. It applied for a tax credit to recoup some of its research and development costs. PESCO applied for a credit of $88,014 for 2014 and $79,827 for 2016. TRD denied both applications, and PESCO protested these denials. TRD requested an independent hearing with the AHO, and the CHO presided over the hearing.

{3}      PESCO retained CliftonLarsonAllen (CLA), an accounting firm, to assist it in its original application for the New Mexico tax credit and for a similar federal tax credit.[1] CLA assisted PESCO in submitting a claim for a tax credit based on wages paid to draftsmen and engineers who were engaged in research and development of products. CLA also developed a methodology to quantify PESCO's time and wages related to its research and development activities. During normal operations, PESCO creates "drafting logs" when the work is performed to track how much work is committed to new research and development projects. CLA reviewed these drafting logs and interviewed PESCO's engineers to determine which of PESCO's projects qualified for the tax credit.

---

[1]Below, PESCO also argued that the state and federal tax credits are similar, therefore, the proof needed to substantiate qualified expenditures should be the same. The CHO noted that the federal equivalent did not include a cost accounting requirement, therefore, this argument failed. PESCO does not abandon this argument on appeal, however, we affirm the CHO's decision as we are "not at liberty to read out the statutory difference between the state credit and federal law" either.

{4}     At the hearing, several witnesses testified on behalf of PESCO: Mr. Marcus Mims, a Certified Public Accountant with CLA, Mr. Michael DePrima, a tax attorney employed by CLA, and Mr. Jim Rhodes, Vice President of Engineering at PESCO, and chair of its board. Mr. DePrima and Mr. Mims testified to their work in preparing PESCO's applications for the 2014 and 2016 tax credits. Mr. Rhodes testified that PESCO does not maintain a detailed project time-keeping system because implementing such a system is burdensome and expensive only for research and development tracking. Mr. Rhodes stated that he informally uses a method substantially similar to CLA's when deciding whether to let a project move forward. However, Mr. Rhodes does not have any written work product to show how he uses this informal cost accounting methodology.

{5}     In resolving this case, the CHO stated that it was clear from Mr. Mims's and Mr. DePrima's testimony that "the methodology employed [by CLA] was a fair, true, and reasonable accounting [of PESCO's] labor costs for the research and development costs." Based on this testimony, the CHO found that PESCO (1) uses a cost accounting method as required by the Act, and (2) informally uses this same method in its other business activities. TRD appeals this decision by the CHO, arguing that the CHO erred in its findings. We reserve discussing additional facts where appropriate for our analysis.

# DISCUSSION

{6} Under the Act, taxpayers must meet specific requirements to qualify for a tax credit. Section 7-9F-6(A) of the Act provides:

> A taxpayer conducting qualified research at a qualified facility and making qualified expenditures is eligible to claim the basic credit pursuant to the . . . Act.

{7} Here, the parties do not dispute that PESCO is engaged in qualified research and that the research is being performed at a qualified facility. The parties disagree as to the third requirement of this section, that PESCO is making "qualified expenditures." More specifically, the parties disagree concerning the accounting method used by PESCO to determine whether an expenditure is a "qualified expenditure" under the Act. The Act defines a "qualified expenditure" as

> an expenditure or an allocated portion of an expenditure by a taxpayer in connection with qualified research at a qualified facility, including expenditures for depletable land and rent paid or incurred for land, improvements, the allowable amount paid or incurred to operate or maintain a facility, buildings, equipment, computer software, computer software upgrades, consultants and contractors performing work in New Mexico, payroll, technical books and manuals and test materials, but not including any expenditure on property that is owned by a municipality or county in connection with an industrial revenue bond project, property for which the taxpayer has received any credit pursuant to the Investment Credit Act, property that was owned by the taxpayer or an affiliate before July 3, 2000 or research and development expenditures reimbursed by a person who is not an affiliate of the taxpayer.

Section 7-9F-3(G). The Act further provides:

4

> If a "qualified expenditure" is an allocation of an expenditure, the cost accounting methodology used for the allocation of the expenditure shall be the *same* cost accounting methodology used by the taxpayer in its other business activities.

*Id.* (emphasis added).

{8} The issues before us require us to determine whether PESCO satisfied the statutory requirements for its claimed "qualified expenditures"—namely, whether PESCO utilized a cost accounting methodology as prescribed under the Act and whether it used the same methodology in its other business activities. To resolve the matter, we begin by determining the meaning of the term "cost accounting methodology" within the Act, as the Act does not define this term, and we have not previously construed Section 7-9F-3. Consequently, we are presented with a question of first impression.

## I. "Cost Accounting Methodology" Under the Act

{9} Our review of this issue is de novo. *High Desert Recovery, LLC v. N.M. Tax'n & Revenue Dep't*, 2022-NMCA-048, ¶ 7, 517 P.3d 258 (reviewing an AHO's interpretation of a statute under de novo review). "When a taxpayer claims an exemption or deduction from a tax, strict rules of construction structure a court's analysis: (1) the court must construe the statute allowing the exemption or deduction in favor of the taxing authority; (2) the statute must clearly and unambiguously express the right to the exemption or deduction; and (3) the taxpayer must clearly

5

establish the right to the exemption or deduction." *N.M. Tax'n & Revenue Dep't v. Dean Baldwin Painting, Inc.*, 2007-NMCA-153, ¶ 12, 174 P.3d 525.

{10} In this case, the CHO consulted a number of dictionaries to determine what constitutes a cost accounting method and, informed by those definitions, found that PESCO used an accounting method that was "designed to record and analyze [its] labor costs incident to the research and development projects it was engaged in, and to that extent it constituted a cost accounting method consistent with the plain language meaning of that term, as shown by the dictionary definitions." TRD argues that the CHO left out a "key-element" of the definition—specifically, that a true cost accounting methodology must aid the taxpayer's management in measuring financial performance. We disagree for the reasons that follow.

{11} When presented with a question of statutory construction, first, "we begin with the plain meaning of the statute's words and construe its provisions together to produce a harmonious whole." *Rivera v. Flint Energy*, 2011-NMCA-119, ¶ 4, 268 P.3d 525. The text of the statute is the "primary indicator of legislative intent." *Bishop v. Evangelical Good Samaritan Soc.*, 2009-NMSC-036, ¶ 11, 146 N.M. 473, 212 P.3d 361. When a term is not defined in a statute, we must construe it, giving those words "their ordinary meaning absent clear and express legislative intention to the contrary." *State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863 (internal quotation marks and citation omitted). In doing so, dictionary

definitions may provide guidance about the ordinary meaning of the words at issue. *Unified Contractor, Inc. v. Albuquerque Hous. Auth.*, 2017-NMCA-060, ¶ 72, 400 P.3d 290. The granting of a tax credit represents an act of legislative grace; therefore, the language of the tax credit statute must be construed narrowly. *Sec. Escrow Corp. v. N.M. Tax'n & Revenue Dep't*, 1988-NMCA-068, ¶ 9, 107 N.M. 540, 760 P.2d 1306. Although a tax credit must be narrowly interpreted, it should be construed reasonably and consistently with legislative intent. *See id.*

{12}    As we explain, after thoroughly reviewing the record, briefing, and oral argument, we conclude that "cost accounting methodology" is a term of art, and we define it as such. When a statute uses a phrase as a term of art, we must "interpret these terms in accordance with case law interpretation or statutory definition of those words, if any." *Helen G. v. Mark J.H.*, 2008-NMSC-002, ¶ 42, 143 N.M. 246, 175 P.3d 914 (internal quotation marks and citation omitted); *see also W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 91 n.5 (1991) (noting that terms of art "*depart from ordinary meaning*"), *superseded by statute as stated in Stender v. Lucky Stores, Inc.*, 780 F. Supp. 1302 (1992). "[I]t is a well-established canon of statutory construction that 'technical terms or terms of art in a statute [retain] their *technical* meaning.'" James A. Heilpern, *Dialects of Art: A Corpus-Based Approach to Technical Term of Art Determinations in Statutes*, 58 Jurimetrics J. 377, 380 (2018)

(quoting 2A Norman J. Singer & Shambie Singer, *Statutes & Statutory Construction* § 47:29 (7th ed. 2007)).

**{13}** In New Mexico, we have concluded that "our interpretation of technical language in a statute can and should be informed by evidence concerning how those technical terms are interpreted by experts in the pertinent field." *Dynacon, Inc. v. D & S Contracting, Inc.*, 1995-NMCA-071, ¶ 21, 120 N.M. 170, 899 P.2d 613. "Terms can acquire a particular meaning by legislative definition or otherwise" and "a term may take on a particular meaning in a certain area of law or industry." *Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 737 (10th Cir. 2020) (emphasis, internal quotation marks, and citation omitted). "To ascertain the acquired meaning of a term, . . . courts may look outside the [statute] to related sources." *Id.* (alteration, internal quotation marks, and citation omitted). "These related sources include industry guides, informal state agency materials, and statutes and regulations from other jurisdictions." *Id.* "[W]e do not assume that a statutory word is used as a term of art where that meaning does not fit. Ultimately, context determines meaning, and we do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense." *Johnson v. United States*, 559 U.S. 133, 139-141 (2010) (internal quotation marks and citations omitted).

**{14}** Because the text of the Act does not define "cost accounting methodology," consistent with traditional canons of statutory construction set out above, we will

first consider dictionary definitions to determine the meaning of this phrase. *See City of Eunice v. N.M. Tax'n & Revenue Dep't*, 2014-NMCA-085, ¶ 14, 331 P.3d 986. *Black's Law Dictionary* defines "cost accounting method" as "[t]he practice of recording the value of assets in terms of their historical cost." *Cost Accounting Method*, *Black's Law Dictionary* (11th ed. 2019). This definition provides guidance about the ordinary meaning of the words, but under the Act, the meaning and usage of cost accounting method has apparently departed from this ordinary meaning because the historical value of assets has no apparent relation to calculating whether an expenditure qualifies for the credit at issue. *See* § 7-9F-3(G). Further, the limited New Mexico case law discussing cost accounting does not attempt to define this phrase. *See, e.g.*, *Co-Con, Inc. v. Bureau of Revenue*, 1974-NMCA-134, ¶ 47, 87 N.M. 118, 529 P.2d 1239 (Sutin, J., dissenting) (noting that a company's accounting records and tax records were evidence of cost accounting allocations for equipment). "Thus, we turn to other tools of statutory construction." *Benavides v. E. N.M. Med. Ctr.*, 2014-NMSC-037, ¶ 25, 338 P.3d 1265.

{15}     It appears to us, and the parties have noted, "cost accounting methodology" has taken on a particular meaning in the accounting industry as a term of art. *See Helen G.*, 2008-NMSC-002, ¶ 42 (stating that we interpret terms of art "in accordance with case law interpretation or statutory definition" (internal quotation marks and citation omitted)). Thus, we consider how "cost accounting methodology"

9

is interpreted by experts in the field of finance and accounting. *See Dynacon, Inc.*, 1995-NMCA-071, ¶ 21.

{16}	In an attempt to define this term, PESCO and the CHO cite a related source: Investopedia, an online finance-related database, written by accounting experts, with millions of readers, to define "cost accounting methodology."[2] The definition of cost accounting given by Investopedia is written by a certified public accountant (CPA), reviewed by a different CPA, and fact-checked by a professional fact-checker. *See Cost Accounting*, Investopedia, https://www.investopedia.com/terms/c/cost-accounting.asp (last visited Mar. 9, 2023). In other words, Investopedia provides a technical definition of cost accounting written by experts in the accounting industry. Because our interpretation of technical language in a statute "can and should be informed by evidence concerning how those technical terms are interpreted by experts in the pertinent field," *Dynacon, Inc.*, 1995-NMCA-071, ¶ 21, we will rely on the technical definition given to us by Investopedia to interpret the meaning of "cost accounting methodology."[3]

---

[2]While TRD does not urge us to use the Investopedia definition, TRD stated that cost accounting should be defined as a term of art during oral argument. TRD does not argue that this definition would be a wrong or incorrect way of interpreting the Act, either.

[3]While this may be the first time our Court has adopted a term defined by Investopedia, the United States District Court for the District of New Mexico as well as the United States Court of Appeals for the Tenth Circuit have both cited to Investopedia when helpful. *See S.E.C. v. Goldstone*, 301 F.R.D. 593, 603, n.8 (D.N.M. 2014) (noting that "'[a] 'haircut' is [t]he difference between prices at which

10

{17} Investopedia defines "[c]ost accounting" as "a form of managerial accounting that aims to capture a company's total cost of production by assessing the variable costs of each step of production as well as fixed costs, such as a lease expense." *Cost Accounting,* Investopedia, https://www.investopedia.com/terms/c/cost-accounting.asp (last visited Mar. 9, 2023). According to Investopedia, the key element of a "cost accounting method" is an "internally focused, firm-specific system used to estimate cost controls," inventory, and profitability. *Id.* Notably, a cost accounting method is "not required to adhere to set standards and can be *flexible* to meet the particular needs of management." *Id.* (emphasis added).

{18} Thus, a "cost accounting method" is a method for capturing a company's total cost of production by assessing the variable costs at each step in production. This interpretation aligns with the "object and purpose the Legislature sought to accomplish." *Maes v. Audubon Indem. Ins. Grp.*, 2007-NMSC-046, ¶ 11. Under the Act, the Legislature's stated purpose of the tax credit is "to provide a favorable tax climate for technology-based businesses engaging in research, development and

a market maker can buy and sell a security'" (quoting *Haircut*, Investopedia, http://www.investopedia.com/terms/h/haircut.asp (last visited Aug. 23, 2014)); *see also In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1198 (10th Cir. 2015) (noting that "[a]lthough the terms governing margin accounts vary, brokers typically are not required to wait and see if an investor can meet the call; rather, they are entitled to sell the securities held as collateral to meet the deficiency." (citing Investopedia, *Margin Trading: The Dreaded Margin Call*, http://www.investopedia.com/university/margin/margin2.asp) (last visited July 27, 2015)).

11

experimentation and to promote increased employment and higher wages in those fields in New Mexico." Section 7-9F-2. Investopedia's definition is consistent with the Act's stated purpose as our flexible interpretation would promote a favorable tax climate for taxpayers similarly situated to PESCO. *See Maes*, 2007-NMSC-046, ¶ 11; § 7-9F-2. Further, allowing technology-based businesses engaging in research and development to recoup some of their expenses through a tax credit promotes increased employment and higher wages, as our Legislature intended. *See Maes*, 2007-NMSC-046, ¶ 11; § 7-9F-2. Because this interpretation conforms to our obligation to construe the Act narrowly and considers both the statute's text and the legislative intent behind the Act, we adopt it here. *See Bishop*, 2009-NMSC-036, ¶ 11 (stating that "the text of the statute is the primary indicator of legislative intent"); *see also Maes*, 2007-NMSC-046, ¶ 11 (stating that we examine the "purpose the Legislature sought to accomplish").

{19} TRD asserts that, according to Investopedia, a "key element" of a cost accounting methodology is that it "must aid a company's management in measuring financial performance." TRD argues the CHO erred in failing to address this element and suggests that PESCO did not demonstrate that it used the data to measure financial performance, and therefore failed to establish that it was using a cost accounting method. We reject this argument.

12

{20} TRD has not established that using the cost accounting data to measure financial performance is a necessary element of a cost accounting methodology. TRD's argument rests on a single sentence of the Investopedia definition presented by PESCO during the administrative hearing. But nothing in the sentence, in the broader definition, or in the legislative intent behind the Act suggests that an essential element of a cost accounting methodology is that it must be used to measure a company's financial performance. Rather, the touchstone of a cost accounting method is that it allows taxpayers to be flexible in how and why they use it. Indeed, Investopedia explains that "[c]ost accounting is used internally by management in order to make fully informed business decisions" such as measuring costs and output results to measure financial performance *and "mak[e] future business decisions*." *Cost Accounting* Investopedia, https://www.investopedia.com/terms/c/cost-accounting.asp (last visited Mar. 9, 2023 (emphasis added)). Investopdia later explains:

> Cost accounting is helpful because it can identify where a company is spending its money, how much it earns, and where money is being lost. Cost accounting aims to report, analyze, and lead to the improvement of internal cost controls and efficiency.
>
> . . . .
>
> Management can analyze information based on criteria that it specifically values, which guides how prices are set, resources are distributed, capital is raised, and risks are assumed.

13

*Id.* Thus, Investopedia points out that a cost accounting may be undertaken for any number of business purposes; measuring financial performance is only one of those potential applications. Likewise, the Act itself is similarly flexible, requiring only that the taxpayer use the same cost accounting methodology that it relies on in calculating the allocation of its expenditures for purposes of the credit in its other business activities. *See* § 7-9F-3(G). In sum, we find no support for TRD's argument that a cost accounting method must be strictly used to measure a company's financial performance and conclude that a cost accounting method qualifies as such when it can reasonably be said to be internally used by management to make informed business decisions.

**II.     The CHO's Decision**

{21}     This Court will set aside the order only if we find it to be "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." *Team Specialty Prods., Inc. v. N.M. Tax'n & Revenue Dep't*, 2005-NMCA-020, ¶ 8, 137 N.M. 50, 107 P.3d 4; NMSA 1978, § 7-1-25(C) (2015). We analyze each element in turn.

**A.     The CHO Did Not Err in Concluding That PESCO Used a Cost Accounting Method**

{22}     TRD first argues that the CHO erred in concluding that PESCO used a cost accounting method. As we have discussed, TRD specifically contends that the CHO omitted the requirement that a cost accounting method be used to measure financial

14

performance. However, a cost accounting method is flexible for capturing and assessing costs—measuring financial performance is not required under the Act. For the reasons that follow, we affirm the CHO's decision.

{23} We evaluate whether the CHO's decision was arbitrary and capricious based on whether "it is unreasonable or without a rational basis, when viewed in light of the whole record." *N.M. Att'y Gen. v. N.M. Pub. Reg. Comm'n*, 2013-NMSC-042, ¶ 10, 309 P.3d 89 (internal quotation marks and citation omitted). Even if another conclusion may be reached or there is room for two opinions, the action is not arbitrary or capricious if made after due consideration. *N.M. Regul. & Licensing Dep't v. Lujan*, 1999-NMCA-059, ¶ 8, 127 N.M. 233, 979 P.2d 744. Further, the hearing officer's decision is not in accordance with law "if the [hearing officer] unreasonably or unlawfully misinterprets or misapplies the law." *Elephant Butte Irrigation Dist. v. N.M. Water Quality Control Comm'n*, 2022-NMCA-045, ¶ 8, 516 P.3d 231 (internal quotation marks and citation omitted). "Whether a ruling or decision . . . is not in accordance with law is a question of law to be decided by [this C]ourt." *Lujan*, 1999-NMCA-059, ¶ 8 (internal quotation marks and citation omitted). Thus, this Court's review of whether a hearing officer's decision is in accordance with the law is de novo. *See id.*

{24} As an initial matter, the CHO evaluated whether PESCO used a cost accounting method based on the same general principles we have described above,

15

and consequently, there is no basis for concluding that the CHO misinterpreted or misapplied the law. Applying that definition here, the record supports the CHO's conclusion that PESCO used a cost accounting method. The CHO reached this conclusion based largely on testimony from Mr. Rhodes, chair of PESCO's board, Mr. Mims, a CPA with CLA, and Mr. DePrima, a tax attorney who has an LLM in tax and is employed with CLA.

{25} After hearing from these witnesses, the CHO found that CLA sent staff to PESCO to inspect their records, interview witnesses, and develop a method to quantify and assess PESCO's time and wage costs associated with its research and development activities. The CHO also found that CLA determined which of PESCO's projects would qualify for a tax credit by reviewing drafting logs created contemporaneously during the time work was performed. The CHO further found that PESCO has used this same method since 2011 to apply for state and federal tax credits and that this method only accounts for finished projects. This method does not include projects where no viable product was created.

{26} The CHO stated that it was "clear that the method [PESCO] used was designed to record and analyze [PESCO]'s labor costs incident to the research and development projects it was engaged in, and to that extent it constituted a cost accounting method." Thus, the CHO's finding that PESCO used a "cost accounting

method" is consistent with the Act and is grounded in a rational basis based on the record. *See N.M. Att'y Gen.*, 2013-NMSC-042, ¶ 10. Even if another conclusion could have been reached, the CHO's conclusion, in this case, cannot be construed as arbitrary or capricious. *See Lujan*, 1999-NMCA-059, ¶ 8. Consequently, we will not set aside the CHO's decision because it is not arbitrary, capricious, or contrary to law. *See Team Specialty Prod., Inc.*, 2005-NMCA-020, ¶ 8.

**B.    Substantial Evidence**

{27}    TRD also argues that substantial evidence does not support the CHO's finding that PESCO used the same cost accounting method in its other business activities. We disagree and explain.

{28}    "For questions of fact, [we] look to the whole record to determine whether substantial evidence supports the [agency]'s decision." *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n*, 2019-NMSC-012, ¶ 14, 444 P.3d 460 (alteration, internal quotation marks, and citation omitted). "Substantial evidence requires that there is evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Id.* (internal quotation marks and citation omitted). "[W]e will not substitute our judgment for that of the agency; although the evidence may support inconsistent findings, we will not disturb the agency's finding if supported by substantial evidence on the record as a whole." *Rodriguez v. Permian Drilling Corp.*,

17

2011-NMSC-032, ¶ 7, 150 N.M. 164, 258 P.3d 443 (omission, internal quotation marks, and citation omitted). Further, if more than one inference can be drawn from the evidence, "the inference drawn by the hearing officer is conclusive." *Kewanee Indus., Inc. v. Reese*, 1993-NMSC-006, ¶ 6, 114 N.M. 784, 845 P.2d 1238. "We do not reweigh the evidence" on which the hearing officer's inference is based. *Id.* "Under whole record review, evidence is viewed in a light most favorable to upholding the agency's determination, but favorable evidence is not viewed in a vacuum that disregards contravening evidence." *Bass Enters. Prod. Co. v. Mosaic Potash Carlsbad Inc.*, 2010-NMCA-065, ¶ 28, 148 N.M. 516, 238 P.3d 885.

{29}     The CHO found that PESCO used a cost accounting methodology and used the same cost accounting methodology in other business activities as required by the Act. The CHO reached this conclusion after hearing witness testimony, considering the facts and evidence in the record, and considering the Legislative purpose behind the act as well as consulting dictionaries to determine what the Legislature meant by the phrase "cost accounting methodology." Specifically, citing to testimony from Mr. Rhodes, the CHO found that "[PESCO] informally uses that same methodology as CLA used for the tax credit to determine the continuing viability of a research and development project by comparing the drafting time shown on the drafting logs against the potential results/outcome/viability of the project."

18

**{30}** At the hearing, TRD asked Mr. Rhodes if PESCO uses a cost accounting methodology designed by CLA. Mr. Rhodes stated that PESCO does use this method. TRD also asked Mr. Rhodes if PESCO uses CLA's method in its other business activities. Mr. Rhodes further stated that he uses this same method "informally" and that he uses this method when deciding whether a project will proceed or not. Significantly, the CHO stated that it found Mr. Rhodes highly credible and straightforward. This testimony constitutes substantial evidence supporting the CHO's decision.

**{31}** On appeal, TRD argues that some of PESCO's witnesses testified that PESCO did not use the cost accounting method used by CLA in its other business activities. TRD argues that PESCO did not provide evidence about utilizing a cost accounting method in their other business activities. This argument overlooks the testimony from Mr. Rhodes, and the fact that it is well-settled in New Mexico that the testimony of a single witness, if found credible by the fact-finder, is sufficient to constitute substantial evidence. *See Autrey v. Autrey*, 2022-NMCA-042, ¶ 9, 516 P.3d 207, *cert. granted*, (S-1-SC-39371, Aug. 10, 2022); *see also Littell v. Allstate Ins. Co.*, 2008-NMCA-012, ¶ 13, 143 N.M. 506, 177 P.3d 1080 ("In reviewing a sufficiency of the evidence claim, this Court views the evidence in a light most favorable to the prevailing party and disregards any inferences and evidence to the contrary." (alteration, internal quotation marks, and citation omitted)).

**{32}** The dissent argues that because Mr. Rhodes and PESCO did not use CLA's results to make business decisions, CLA's cost accounting method is not used by PESCO in its other business activities. *See dissent* ¶ 3. However, this argument would require us to disregard Mr. Rhodes's testimony and substitute our judgment for the fact-finder. This we will not do. As well, the Act does not require that taxpayers use the *results* of the cost accounting method in their other business activities—rather, they need only use the same *methodology* elsewhere.

**{33}** Thus, from the evidence and testimony that the CHO received and reviewed and our review of the record, we conclude that substantial evidence supports the CHO's determination that PESCO used the same cost accounting method in its other business activities. Accordingly, viewing the evidence in a light most favorable to upholding the agency's determination, we hold that the decision and order of the CHO is supported by substantial evidence. *See Bass Enters. Prod. Co.*, 2010-NMCA-065, ¶ 28.

## IV. The Burden of Proof

**{34}** Lastly, TRD argues that the CHO misplaced the burden of proof because the burden is on the taxpayer to establish its right to a state credit, and the CHO excused PESCO from meeting this burden. While, initially, the burden is on the taxpayer to overcome the presumption of correctness in TRD's assessment, PESCO met this rebuttable presumption below. Therefore, the burden shifted to TRD to show that

PESCO did not qualify for the tax credit. *See Gemini Las Colinas, LLC v. N.M. Tax'n & Revenue Dep't*, ___-NMCA-___, ¶¶ 23, 26 ___P.3d___ (A-1-CA-38672, Mar. 13, 2023) (holding that the first step in resolving a tax protest is "determining whether the taxpayer has overcome the presumption of correctness" and, if so, then in the second step "the burden of production . . . shifts to the department"). We explain.

{35}    "The effect of the presumption of correctness is that the taxpayer has the burden of coming forward with some countervailing evidence tending to dispute the factual correctness of the assessment made by the secretary." *MPC Ltd. v. N.M. Tax'n & Revenue Dep't*, 2003-NMCA-021, ¶ 13, 133 N.M. 217, 62 P.3d 308 (internal quotation marks and citation omitted). As this Court recently determined, the initial burden on the taxpayer is a burden of production, *see Gemini Las Colinas, LLC*, ___-NMCA-___, ¶¶ 26, 29, and the taxpayer may overcome the presumption of correctness of the assessment by "present[ing] evidence and to show that the decision of [TRD] is not supported by substantial evidence." *Floyd & Berry Davis Co. v. Bureau of Revenue*, 1975-NMCA-143, ¶ 8, 88 N.M. 576, 544 P.2d 291. "Unsubstantiated statements that the assessment is incorrect cannot overcome the presumption of correctness." *MPC Ltd.*, 2003-NMCA-021, ¶ 13 (internal quotation marks and citation omitted).

21

**{36}** If the taxpayer overcomes the presumption of correctness, the burden of production shifts to the TRD to "put forth evidence to show the correctness of its assessment—that is, evidence sufficient to make the correctness of [TRD]'s assessment a question of fact." *Gemini Las Colinas, LLC*, ___-NMCA-___, ¶ 29. However, the burden of persuasion is never shifted from the taxpayer on to TRD. *See id.* ¶ 26 ("[T]he burden of persuasion is ultimately borne by the taxpayer."). "If [TRD] meets this burden (by way of its own case in chief), the hearing officer has heard the evidence of both sides and must then perform fact-finding duties to grant or deny the protest." *Id.* ¶ 30.

**{37}** Here, PESCO presented evidence—both written and through the testimony of its witnesses—to establish that it was entitled to a tax credit under the Act. Thus, PESCO met its burden. *See id.* ¶ 29. We assume, without deciding, that TRD also met its burden, because the CHO made findings of fact and conclusions of law, acting as a trier of fact. *See id.* ("If [TRD]'s evidence creates a question of fact about the correctness of the assessment, it has fulfilled its burden of production, and the case is ripe for the hearing officer to resolve factual disputes and decide the protest on the merits.").

**{38}** Nothing suggests that the CHO misplaced the burden of production or persuasion.

22

**CONCLUSION**

{39}     For the reasons set forth above, we affirm.

{40}     **IT IS SO ORDERED.**


_____
                                    **GERALD E. BACA, Judge**

**I CONCUR:**


_____
**MEGAN P. DUFFY, Judge**


**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation (concurring in part and dissenting in part).**

**BUSTAMANTE, Judge, retired, sitting by designation (concurring in part and dissenting in part).**

{41}   I respectfully dissent. In my view the issues in this case can be summarized as follows: First, was the phrase "cost accounting methodology" as used in Section 7-9F-3(G) intended by the Legislature to be interpreted and applied as an accounting term of art? Second, if so, does the allocation process devised by CLA for PESCO qualify as a "cost accounting methodology?" Third, if so, does PESCO use CLA's methodology "in its other business activities?" The majority answers each of the inquiries in the affirmative. *Maj. op.* ¶¶ 12, 18-23, 24-26, 30. I agree that the phrase was intended to be used and applied as a term of art. Given TRD's concession that the concept of cost accounting, even as a term of art, is not rigid, but rather flexible and context dependent, I can also agree that the CHO here could reasonably conclude as a matter of fact that CLA's method qualifies as a cost accounting methodology within the meaning of the statute. Applying the phrase as a term of art, however, I conclude that there is insufficient evidence in the record to support the CHO's decision that PESCO uses CLA's methodology "in its other business activities." *See* § 7-9F-3(G).

{42}   PESCO's primary argument throughout the litigation has been that Section 7-9F-3(G) is simply a nondistortion provision intended only to assure that the tax credit requests are not inflated. As such, it has emphasized that its approach to calculating the credit is very conservative given that it did not attempt to allocate cost items such

24

as fixed costs and physical facility expenses. The definition of cost accounting that PESCO provided in its prehearing brief to the CHO included a requirement that the results of the program be used by management in measuring financial performance. It then asserted that PESCO was not trying to capture and allocate costs for management purposes. At the hearing, one of the architects of CLA's methodology agreed that the program was not intended to help understand management performance. If CLA's program was not designed to assess performance, it is difficult to see how it and its results can fit the separate requirement of the Act that the cost accounting methodology be "used by the taxpayer in its other business activities." *Id.*

{43} PESCO offers, and the majority accepts, a single item of testimony from Mr. Rhodes that he "informally" uses the "same method when [he] decide[s] whether to let a project proceed or to kill a project and it's just based on [his] ability to know how much time it is going to take and what percentage of time of [his] engineer's time it's going to take [his] engineers on a project. If [he] know[s] that it's going to take 50 percent of their time to work on a [research and development] project that may or may not be viable, [he] will kill that project. So informally, [he] think[s he is] using that same methodology as CLA used formally to determine these amounts for these tax credits." Nowhere did Mr. Rhodes testify that he used or even referred to the actual results of CLA's process in his decision making. All he said was that

he used the same source of raw data—the drafting logs—to make business decisions. In addition, Mr. Rhodes did not testify that he ever reviewed or used CLA's engineer interviews in his decision making.

{44} Thus, it is apparent that the actual results of CLA's process are only used for the tax credit. The disconnect between the results of CLA's process and the actual way PESCO makes business decisions convinces me that the second requirement of the Act has not been met or proven. *See id.* For these reasons, I respectfully dissent from the final portion of the majority opinion and would reverse the CHO's decision.

_____
**MICHAEL D. BUSTAMANTE, Judge,
retired, sitting by designation.**